UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL WHITE,

     Plaintiff,

                                             Case No. 20-cv-11543

v.                                      Hon. Matthew F. Leitman

CITY OF SOUTHFIELD, *et al.*,

     Defendants.

_____/

## ORDER (1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 48) AND (2) TERMINATING REMAINING PENDING MOTIONS AS MOOT (ECF Nos. 59, 60)

This is yet another case in which a tense encounter between law enforcement officers and a mentally ill citizen ended with an unfortunate outcome. On January 9, 2020, the City of Southfield Police Department received a call about a domestic disturbance at a local residence. A caller informed a dispatcher that a woman with a psychological disorder – Plaintiff Crystal White – was combative, had been armed with a knife at one point, and was trying to take custody of her daughter even though she had relinquished her parental rights. Three Southfield Police Officers – Defendants Matthew Fair, Jordan Woodside, and Arthur Rucinski – responded and found White in the driveway of her parents' home. During the officers' ensuing encounter with White, she disobeyed their lawful commands and physically resisted

1

their lawful effort to restrain her.  In an effort to gain control of White, the officers tased and struck her.

In this action, White claims that the officers used excessive force against her in violation of the Fourth Amendment and state law.  She further alleges that as a result of the officers' misconduct, she lost her pregnancy and suffered other serious injuries.  She also brings a claim of municipal liability against the City of Southfield.

Discovery has closed, and the Defendants have now moved for summary judgment on all of White's claims.  The individual Defendants argue that they are entitled to qualified and governmental immunity.  The City of Southfield contends that White has not presented sufficient evidence to sustain a municipal liability claim.  The Court agrees that all Defendants are entitled to summary judgment.

While White has shown that the officers could, perhaps, have dealt with her in a manner that would have avoided the need to use force – say, by working harder to de-escalate the tension through continued dialogue – she has failed to show that the officers violated her clearly-established rights or violated state law when, in response to her active resistance, they tased and struck her.  White has also failed to identify any evidence to support her municipal liability claim against the City of Southfield.  For these reasons and those explained in more detail below, the Court will **GRANT** Defendants' motion for summary judgment.

# I

## A

On the evening of January 9, 2020, White's sister, Cynthia Ospina, called the Southfield Police Department to request assistance due to a domestic disturbance at her parents' home. (*See* 911 Tr., ECF No. 54-2.)  White could be heard yelling and cursing in the background of that call. (*See id.*)

Ospina told a dispatcher that White was "combative," "unrestrainable," and suffered from "psychological problem[s]" and "mental disorders." (*Id.*, PageID.1719, 1721.)  She also told the dispatcher that White was "trying to attack [her]" and that while White was not currently armed, White had been "threatening people" and "grabbing knives and things." (*Id.*, PageID.1719-1720.)  Finally, Ospina said White was "trying to take our niece" (White's daughter) even though White had "signed off" on her parents having "temporary custody" of the child. (*Id.*, PageID.1724-1725.)

## B

Officers Fair, Woodside, and Rucinski were dispatched to the scene.  Before arriving, the officers received information about the ongoing disturbance from their in-car computer systems.  They were told, among other things, that:

- White was "trying to attack [her sister]/[was] extremely combative;"

3

- White was "grabbing knives from the kitchen" but, importantly, was "not currently armed with any knives;"

- White had been "diagnosed with multiple mental issues;" and

- White was "trying to take her daughter" even though she had "signed off her [parental] rights."

(Computer Aided Dispatch Printout, ECF No. 48-3, PageID.1118.)

When the officers arrived, they encountered White standing in the driveway of her parents' home.  Their interactions with her were captured on Fair's in-car video system (*see* Video, ECF No. 48-4), and the Court describes below what the video recording clearly depicts.[1]

---

[1] White also described her interaction with the officers during her deposition. (*See* White Dep., ECF No. 48-8.)  Her version of events is inconsistent and irreconcilable with the video in several significant respects.  As one example, White testified that she spoke with the officers for "at least 20 minutes" before she was detained even though the actual amount of time between when the officers first approached White and then detained her was approximately ninety seconds. (*Id.* at 79, PageID.1415.) To the extent that White's testimony is contradicted by the dash-cam video, the Court discards that testimony and accepts the version of events depicted in the video. *See*, *e.g.*, *Scott v. Harris*, 550 U.S. 372, 381 (2007) (explaining that where the events in question are captured on video, a court should "view[] the facts in the light depicted by the videotape"); *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (explaining that "where [] police dash-cam video[] depict[s] all of the genuinely disputed facts, we view the facts in the light depicted by the videotape[]") (internal citations and punctuation omitted).  Importantly, no portion of White's testimony that is uncontradicted by the video creates a material factual dispute that precludes the entry of summary judgment against her.

The relevant portion of the video begins with the officers approaching White on foot while she is standing in her parents' driveway next to her minivan. (*See id.* at 5:17.) Even though it is a cold January evening, White is wearing only a nightgown. (*See id.*) Fair directs White "to stay right there." (*Id.* at 5:35.) White responds, but her response is not audible. (*See id.*) Fair then tells White, "do not get in the car." (*Id.* at 5:38.) White responds, but again, that response is not audible.[2] (*See id.* at 5:41.) White then begins walking toward Fair and a second officer who were standing at the end of the driveway. (*See id.* at 5:43.) Fair tells White to drop what is in her hand and to stop walking toward him. (*See id.* at 5:45.) But White keeps walking toward the officers while yelling "I didn't do anything." (*Id.* at 5:47.) Fair repeats his command that White stop walking, but White nonetheless continues walking down the driveway toward him and yelling at him. (*See id.* at 5:53.) As White moves closer to Fair, he backs up in an effort to maintain a safe distance between himself and White. (*See id.*)

Finally, White comes to a complete stop. (*See id.* at 5:55.) White then lifts up her nightgown and exposes herself to the officers in an attempt to show them that she is unarmed. (*See id.* at 5:56.) No weapons are visible when White raises her

---

[2] As noted above, two of White's responses to the officers' instructions are not audible on the recording. White testified at her deposition that during these inaudible segments, she was instructing the officers where to park. (*See* White Dep. at 68, 70, ECF No. 48-8, PageID.1404, 1406.) That testimony by White does not change the analysis or result here in any way.

nightgown. (*See id.*)   White also tells the officers that she does not have any weapons. (*See id.*)

At this point, the officers decided to detain White "for her own safety as well as the safety of others." (Fair Dep. at 29, ECF No. 48-5, PageID.1149.) Fair explained that based on White's "more-than-normal behavior [such as] exposing herself, not listening to all of [his] commands, [and her] demeanor," he "felt it was necessary that [she] be temporarily detained to preserve the safety of us, herself, and so [the officers] could further [their] investigation." (*Id.* at 54, PageID.1174.)   Fair believed that White was "exemplifying several telling signs that her own safety and our safety was in jeopardy." (*Id.* at 58, PageID.1178.)   Thus, because "there [was] no telling what [White] may have done to one of [the officers] or tried to do" if the officers had warned her before attempting to detain her, Fair believed it was best to attempt to detain her without giving her "a warning prior to approaching her." (*Id.* at 106, PageID.1226.)   Woodside was the officer who attempted to restrain White. (*See* Woodside Dep. at 28, ECF No. 48-6, PageID.1259.)

The video depicts Woodside approaching White and placing his hands on her in an attempt to restrain her. (*See* Video, ECF No. 48-4, at 6:00.)   He does not give White any advance notice that he will be touching her. (*See id.*)   As Woodside grabs White, White turns toward him, flails her arms in an up and down motion, and makes physical contact with Woodside. (*See id.* at 6:02.)   There is then a physical struggle

6

between White and the officers. (*See id.* at 6:05.)   During this struggle, Fair deploys his taser on White. (*See id.* at 6:06.)   One of the officers then tells White to get on the ground, but she does not do so. (*See id.* at 6:07.)   Instead, she begins moving away from the officers. (*See id.* at 6:08.)   She heads down the driveway toward the street. (*See id.* at 6:09.)   The officers repeatedly tell her to "get on the ground," but White does not follow those commands. (*Id.* at 6:10.)

White and the officers then disappear behind a second minivan parked in front of White's parents' house.   They are no longer visible on the video.   But the audio portion of the recording reveals that the struggle continues off-camera. (*See id.* at 6:20.)   The audio reveals that Fair deploys his taser a second time during the tussle.[3] (*See id.* at 6:24.)   And we now know that Woodside also struck White in the face during that struggle. (*See* Woodside Dep. at 48, ECF No. 48-6, PageID.1279.)   He later explained that he hit her as a "distraction[]" technique so the other officers could restrain her. (*Id.*)   After Woodside struck White, the officers were able to secure her.[4] (*See* Video, ECF No. 48-3, at 6:52.)   This entire encounter between the

_____

[3] The parties disagree as to whether Fair's taser deployments were effective.   Fair testified his first deployment of the taser "didn't work" and "was not effective." (Fair Dep. at 75-76, ECF No. 48-5, PageID.1195-1196.)   White insists both deployments of the taser were effective. (*See* White Dep. at 81-82, ECF No. 48-8, PageID.1417-1418.)   For the purposes of this motion, the Court will accept White's testimony that both taser deployments were effective.

[4] The Judge previously assigned to this case also reviewed and summarized the video of the events in question. (*See* Op. and Order, ECF No. 34, PageID.651.)   That review was conducted without the benefit of a full summary judgment record.   This

officers and White lasted roughly ninety seconds, and only approximately twenty seconds elapsed from the initial tasing by Fair until the officers had White under control. (*See id.*)

## C

White says that as a result of the officers' conduct, she suffered serious injuries, including bruising, burned skin, and damage to her teeth. (*See* White Dep. at 100-101, ECF No. 48-8, PageID.1436-1437.)  In addition, White was pregnant, and she claims that the officers' use of force caused her to lose her unborn baby. (*See id.*, PageID.1442-1443.)

## II

White filed this action against the City of Southfield and Officers Fair, Woodside, and Rucinski on June 12, 2020. (*See* Compl., ECF No. 1; Am. Compl., ECF No. 3.)  In her Amended Complaint, she brings federal claims against the Defendants under 42 U.S.C. § 1983 as well as claims under state law.  White's claims are as follows:

- Count I – "Violation of 42 U.S.C. § 1983 – Excessive Force" brought against Defendants Fair, Woodside, and Rucinski;

---

Court's review of the video does not differ in any meaningful way from that Judge's summary.  It merely includes some additional supplemental facts that are now in the record.

- Count II – "Violation of 42 U.S.C. § 1983 – Excessive Force Causing the Stillbirth of Baby White" brought against Defendants Fair, Woodside, and Rucinski;
- Count III – "Failure to Intervene" brought against Defendants Fair, Woodside, and Rucinski;
- Count IV – "42 U.S.C § 1983 – *Monell* Liability" brought against the City of Southfield;
- Count V – "Gross Negligence" brought against Defendants Fair, Woodside, and Rucinski; and
- Count VI – "Assault and Battery" brought against Defendants Fair, Woodside, and Rucinski.

Defendants moved for summary judgment on November 24, 2021. (*See* Mot., ECF No. 48.) The Court held a hearing on the motion on November 29, 2022. Defendants have also filed two additional motions: (1) a motion to strike certain expert opinion testimony and for sanctions (*see* Mot., ECF No. 59) and (2) a motion *in limine* to exclude certain character and prior acts evidence at trial (*see* Mot., ECF No. 60.)

### III

Under Federal Rule of Civil Procedure 56, a movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 312, 326-27 (6th Cir. 2013) (quoting Fed. R. Civ. P. 56). When reviewing the record, "the court must

view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* But "the mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52.

## IV

### A

The Court will begin with White's excessive force claims in Counts I and II of her Amended Complaint. But before turning to those claims, it is important to clarify that White does not challenge the lawfulness of the first force that was applied against her – *i.e.*, Woodside's grabbing of her arm. For instance, she does not claim that Woodside used excessive force when he grabbed her arm. Nor does she claim that Woodside lacked the lawful authority to restrain her at that point during her encounter with the officers. On the contrary, at the hearing on Defendants' motion, White's counsel candidly acknowledged that Woodside *did* have the authority to seize White when he grabbed her arm because, at that time, he had probable cause to believe that she had committed the felony offense of resisting and obstructing a

10

peace officer in violation of Mich. Comp. Laws § 750.81d.[5]

Because White does not challenge the lawfulness Woodside's grabbing of her arm, her excessive force claim presents three questions.  First, did Fair use excessive force when he tased White after she resisted Woodside's lawful attempt to restrain her by flailing her arms and making physical contact with Woodside?  Second, did Woodside use excessive force when he struck White as she was struggling with the officers, ignoring their commands to get on the ground, and attempting to move away from them as they tried to restrain her?  Finally, did Fair use excessive force by tasing White a second time when White continued to engage in this behavior and was not yet restrained?[6]

---

[5] The Michigan statute concerning resisting and obstructing a peace officer provides that "an individual who assaults, batters, wounds, resists, obstructs, opposes, or endangers a person who the individual knows or has reason to know is performing his or her duties is guilty of a felony." Mich. Comp. Laws § 750.81d(1).  The statute defines "obstruct[ing]" as, among other things, the "knowing failure to comply with a lawful command." Mich. Comp. Laws § 750.81d(7)(a).  Thus, when White failed to comply with the officers' repeated lawful commands to stop walking toward them, the officers had probable cause to believe that she had violated the statute.  Because the officers had such probable cause, they could lawfully arrest her. See *Coolidge v. New Hampshire*, 403 U.S. 443, 510-11, (1971) (explaining that "a police officer may make an arrest without a warrant when he has probable cause to believe the suspect has committed a felony").

[6] To the extent White brings an excessive force claim against Rucinski, that claim appears to arise out of Rucinski's failure to intervene to prevent the other officers from using excessive force against her. (*See* Resp., ECF No. 54, PageID.1703, explaining that Rucinski "had both the means and opportunity to stop the unconstitutional conduct, but he did not.")  The Court addresses that claim in Section V below.

**B**

Defendants argue that Fair and Woodside are entitled to qualified immunity with respect to White's excessive force claims. (*See* Mot., ECF No. 48, PageID.1083-1091.)  The Court agrees.

**1**

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  "This immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).

Once a defendant raises a qualified immunity defense, the "plaintiff bears the burden of showing that [the] defendant is not entitled to qualified immunity." *Id.* "A qualified-immunity inquiry involves two questions: whether defendants violated a constitutional right and whether that right was clearly established." *Brown*, 814 F.3d at 457.  "These questions may be answered in any order; if either one is

answered in the negative, then qualified immunity protects the official from civil damages." *Id.*

In the qualified immunity context, "[t]he sources of clearly established law to be considered are limited. [Courts in this Circuit] look first to decisions of the Supreme Court, then to decisions of [the Sixth Circuit] and other courts within [the Sixth] [C]ircuit, and finally to decisions of other circuits." *Martin v. City of Broadview Heights*, 712 F.3d 951, 961 (6th Cir. 2013). Courts "must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)). Simply put, defining clearly established law "requires a high 'degree of specificity.'" *Id.* (quoting *Mullenix*, 577 U.S. at 13). And this specificity "is 'especially important in the Fourth Amendment context.'" *Id.* (quoting *Mullenix*, 577 U.S. at 12). Indeed, the Supreme Court has "stressed the need to 'identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment.'" *Id.* (quoting *White v. Pauly*, 580 U.S. 73 (2017)). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Id.* (quoting *Al-Kidd*, 563 U.S. at 741). Thus, as the Sixth Circuit has explained, a "defendant cannot be said to have violated

13

a clearly established right unless the right's contours were sufficiently definite [such] that any reasonable official in the defendant's shoes would have understood that he was violating it.  In other words, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate.'" *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (quoting *Plumhoff*, 134 S.Ct. at 2023).

## 2

At step one of the qualified immunity analysis, White must show that Fair and Woodside violated her right under the Fourth Amendment to be free from "excessive force by law enforcement officers." *Latits v. Phillips*, 878 F.3d 541, 457 (6th Cir. 2017).  The Fourth Amendment allows officers to "use some degree of physical coercion to make an arrest," but it "requires the amount of force to be objectively reasonable under the totality of the particular circumstances." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  When determining whether the amount of force used was constitutionally permissible, courts consider three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  As the Sixth Circuit has explained:

> The reasonableness inquiry is an objective one, considered from the perspective of a hypothetical reasonable officer in the defendant's position and with his knowledge at the time, but without regard to the actual defendant's subjective intent when taking his actions.  The court must avoid the 20/20 vision of hindsight, recognizing that

> officers in tense and evolving situations may have to make a split-second decision about the amount of force that is necessary. The reasonableness analysis thus includes some built-in measure of deference to the officer's on-the-spot judgment.

*Latits*, 878 F.3d at 547 (internal citations and punctuation omitted).

White insists that "[a]ll three *Graham* factors here weigh heavily in [her] favor." (Resp., ECF No. 54, PageID.1692.) She says that because she "did not pose *any* threat" to the officers, "the gratuitous use of force against her was objectively unreasonable" and therefore violated the Fourth Amendment. (*Id.*, PageID.1698; emphasis added. *See also id.*, PageID.1698-1702.)

The Court does not decide whether White has shown that the officers violated her right to be free from excessive force. Instead, the Court proceeds directly to the second step of the qualified immunity analysis: whether it was clearly-established at the time of White's encounter with the officers that the amount and level of force they applied against White was excessive. *See Occupy Nashville v. Haslam*, 769 F.3d 434, 442 (6th Cir. 2014) (explaining that courts "are free to address the second question [of the qualified immunity analysis] first, analyzing whether the constitutional right that purportedly prohibited a defendant's conduct was clearly established, without addressing whether there was a constitutional violation at all") (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)).

**3**

At step two of the qualified immunity analysis, White has the burden to show that the officers violated her clearly-established rights by tasing and striking her when she resisted their lawful effort to restrain her by flailing her arms, making physical contact with Woodside, and struggling with the officers as they tried to restrain her. She has failed to satisfy that burden.

White has not identified any case in which a court has held that a police officer used excessive force by tasing or striking a suspect who, like White, was non-compliant and was physically resisting a lawful attempt to restrain her. Instead, she relies heavily on two cases that are materially distinguishable. White first points to the Sixth Circuit's decision in *Brown v. Lewis*, 779 F.3d 401 (6th Cir. 2015). (*See* Resp., ECF No. 54, PageID.1705.) In *Brown*, "[b]ased on confusing statements overheard by a 911 operator, several police officers pulled over Kishna Brown, ordered her out of her car at gunpoint, threw her to the ground, handcuffed her, and detained her in handcuffs for approximately ten minutes." *Brown*, 779 F.3d at 407. Brown then "sued three officers who seized her, among other defendants, bringing claims under 42 U.S.C. § 1983 and the Fourth Amendment for unreasonable seizure and excessive force." *Id.* The district court concluded that the officers used excessive force when they threw her to the ground during the traffic stop, and the

Sixth Circuit agreed. *See id.* The Sixth Circuit stressed that Brown was not resisting at the time the officers subjected her to force:

> Under Brown's version of the facts, she was entirely compliant throughout the stop, and she had not fled from the police. When the officers told her to put her hands up, she did so. When they ordered her out of the car, she began to move out of the car. However before she could even reach a foot to the ground, two officers grabbed her by the back of her sweatshirt and threw her down. They then ground a knee into her back while placing the handcuffs.
>
> As the district court noted, "the Officers acknowledge that Brown was fully compliant with every one of their orders; they observed no weapons or hostages in her car, and her hands were in clear view throughout the encounter." *Brown,* 2014 WL 353842 at *14. The officers were not certain that any crime had occurred and had several guns pointed directly at Brown if she did begin to resist. The force used here was not reasonable in light of the totality of the circumstances. This is not the type of situation found in *Dunn v. Matatall,* 549 F.3d 348, 354 (6th Cir. 2008), where similar actions during handcuffing were held not to be unreasonable because the suspect had engaged in a high-speed chase with police and failed to unbuckle his seatbelt when ordered to leave the car. The district court was correct to conclude that, in the circumstances present in this case, it was unreasonable for the officers to have pulled Brown from her car and thrown her to the ground.

*Id.* at 418. The court then held that Brown's right to be free from being thrown to the ground was clearly established because, in part, "[t]his circuit has [] concluded that, since at least 2009, the use of violence against a subdued and non-resisting individual has been clearly established as excessive." *Id.* at 419.

The facts of this case differ from the facts in *Brown* in at least one crucial respect: unlike Brown (and as White's counsel conceded at the hearing before the Court), White was actively resisting at the time the officers tased and punched her. The Sixth Circuit has defined "active resistance" as "physically struggling with, threatening, or disobeying officers" and actions involving "physical resistance." *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015). And here, as described above, before Fair tased White for the first time, White resisted Woodside's attempt to detain her, flailed her arms in an up and down motion, and made physical contact with Woodside. Then, before Fair tased her a second time and before Woodside punched her, White moved away from the officers, disobeyed their repeated commands to "get on the ground," and engaged in a physical struggle with the officers. Thus, unlike the plaintiff in *Brown*, White was not "fully compliant with every one of the[ officers'] orders." *Brown*, 779 F.3d at 418. *Brown* therefore does not clearly establish that the force Fair and Woodside used was excessive.

White next cites the First Circuit's decision in *Alexis v. McDonald's Restaurants of Massachusetts, Inc*., 67 F.3d 341 (1st Cir. 1995), which the Sixth Circuit relied upon in *Brown*. (*See* Resp., ECF No. 54, PageID.1705-1706.) But *Alexis* is likewise distinguishable because it involved a non-resisting plaintiff. In *Alexis*, a police officer responded to a report of a disturbance at a fast-food restaurant. The officer told the plaintiff, who was seated at a table eating with her

family, that if she did not leave the restaurant she would be arrested. *See Alexis*, 779

F.3d at 346.  When the plaintiff refused to leave, the officer told her "that she was

being placed under arrest. Then, without asking or directing [the plaintiff] to get up

from the table, [the officer] suddenly and violently grabbed and pulled her bod[y]

from the booth and across the table, handcuffed her hands tightly behind her back,

and, with the help of [a second officer], dragged her from the booth, bruising her

legs in the process." *Id.*  The plaintiff later sued and claimed that the officer's use of

force was excessive.  The First Circuit agreed.  It held that:

> Viewed in context and accepted as true, we are not
> persuaded that the record evidence compelled the
> conclusion that the force with which [the officer] effected
> the sudden, unannounced, violent seizure and removal of
> Alexis's person was objectively reasonable, especially
> since there is no evidence or suggestion that she posed a
> risk of flight, attempted to resist or evade arrest, or
> threatened the peace, property or safety of anyone.

*Id.* at 353.

Like *Brown*, *Alexis* could not have placed Fair and Woodside on notice that

their use of force against White was excessive because *Alexis* involved a non-

resisting suspect who did not try to "evade arrest" or "threaten[] … [the] safety of

anyone." *Id.*  And here, White *was* actively resisting when Fair first tased her, and

when Fair tased her a second time and Woodside punched her, she was disobeying

the officers' commands, moving away from the officers, and physically struggling

with them. *Alexis* therefore did not clearly establish that the force Fair and Woodside used here was excessive.

At the hearing before the Court, White's counsel directed the Court to a string cite of cases in her summary judgment response that, he said, further demonstrate that Fair and Woodside violated White's clearly-established Fourth Amendment rights. (*See* Resp., ECF No. 54, PageID.1697-1698.)  But as White's own description of these cases (in the parentheticals White used to describe the cases in her response) make clear, they involve suspects who were "restrained" and/or "not actively resisting" at the time force was applied. (*Id.*)  But here, it is undisputed (as White's counsel acknowledged at the hearing) that White *was* actively resisting at the time the officers used force against her.   Simply put, White has not identified any authority that would have clearly established that Fair's and Woodside's use of force against her was excessive.

White's counsel also stressed at the hearing that the officers were told before they arrived that White was suffering from a mental health episode.  He argued that because the officers knew White suffered from a mental health condition, they had a continuing obligation to de-escalate the confrontation with White rather than using force against her.   But White has not cited a single case holding that officers may not use a taser or a use a physical strike to gain control of a non-compliant, actively-resisting suspect who is suffering from a mental health episode.

Finally, White's counsel argued at the hearing that there is a material factual dispute that, at a minimum, precludes the entry of summary judgment in favor of Woodside (who, again, is the officer who struck White during the struggle to restrain her) on his qualified immunity defense.  This dispute relates to whether White punched Woodside before he struck her during the struggle.  Counsel highlighted that Woodside testified that White "hit [him] in the head twice." (Woodside Dep. at 28, ECF No. 48-6, PageID.1259.)  And he contrasted that with White's testimony that she did not hit Woodside at all. (*See* White Dep. at 72, 80, ECF No. 48-8, PageID.1408, 1416.)  Counsel insisted that this diverging testimony creates a "huge fact[ual] dispute" that compels the denial of Woodside's motion for summary judgment.  The Court disagrees.

The factual dispute identified by counsel does not preclude summary judgment in favor of Woodside because when that dispute is resolved in White's favor, the result of the qualified immunity analysis does not change.  Even if, as White testified, she did not hit Woodside, it is clear from the video that she actively resisted his efforts to restrain her by, among other things, flailing her arms, making physical contact with Woodside, moving away, ignoring commands, and struggling. And, to repeat, White has not cited a single decision in which the Sixth Circuit (or any other court) has held that an officer used excessive force when he struck a suspect who was resisting law enforcement officers in that manner.  Indeed, the Sixth

Circuit's "cases firmly establish that" an officer may go so far as to "tase someone (even multiple times) when the person is actively resisting arrest." *Rudlaff*, 791 F.3d at 641 (holding that tasing and striking suspect who was resisting arrest by, among other things, swinging his arms in the air when officers attempted to arrest him, was not unconstitutional and did not violate suspect's clearly established rights). Thus, the factual dispute identified by counsel does not preclude the entry of summary judgment in favor of Woodside on his qualified immunity defense.

For all of these reasons, White has not carried her burden to show that Fair and Woodside violated her clearly established Fourth Amendment rights when they used force against her. Fair and Woodside are therefore entitled to qualified immunity with respect to White's Fourth Amendment excessive force claims.

## V

The Court next turns to White's failure to intervene claim in Count III of her Amended Complaint. In this Count, White claims that Fair, Woodside, and Rucinski each failed to prevent the others from subjecting her to excessive force. Defendants argue that the officers are entitled to qualified immunity on this claim. (*See* Mot., ECF No. 48, PageID.1094-1096.) The Court resolves this claim at step one of the qualified immunity analysis because White has failed to show that any of the officers violated her Fourth Amendment rights by failing to intervene.

"Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). In order to show that an officer had the opportunity and means to prevent harm a plaintiff must show "that the incident lasted long enough for [the officer] to both perceive what was going on and intercede to stop it." *Burgess v. Fischer*, 735 F.3d 462, 475 (6th Cir. 2013). Indeed, while "the pertinent decisions make it clear that a police officer cannot stand idly by if he observes the use of excessive force and has the means and opportunity to prevent it [….] none of [those] rulings can be read as requiring that a police officer, in a matter of seconds, *both* determine that a fellow officer is about to use excessive force *and* identify a means to prevent it." *Ontha v. Rutherford Cnty.*, 222 F. App'x 498, 507 (6th Cir. 2007) (emphasis in original). Thus, "courts have been unwilling to impose a duty to intervene where, as here, an entire incident unfolds in a matter of seconds." *Id.* at 506 (internal quotation marks omitted).

White has not shown that any of the Defendant officers had an opportunity to intervene and prevent any of the uses of force against her. The Court starts with Fair's first use of his taser. As described above, Fair initially employed his taser roughly three or four seconds after White began actively resisting Woodside's

attempt to restrain her.  White has not shown that, within that short amount of time, either Woodside or Rucinski knew that Fair was going to tase White or had the opportunity to prevent the tasing.

The same is true for Fair's second use of his taser and for Woodside's punch of White.  Those uses of force happened very quickly and without any meaningful warning as White physically struggled with the officers.  Indeed, the entire physical tussle with White – during which Woodside struck her and Fair tased her for the second time – lasted roughly twenty seconds.  White has not shown that any of the officers had an opportunity to intervene in that compressed time frame to prevent these uses of force.  Defendants are therefore entitled to summary judgment on this claim. *See*, *e.g.*, *Kowolnek v. Moore*, 463 F. App'x 531, 539 (6th Cir. 2012) (granting summary judgment to officers on failure to intervene claim, rejecting argument that "that the [defendant] officers violated a duty by failing to stop [a] taser from being used," and explaining that "[g]iven the rapid sequence of events here, the officers did not have the opportunity to intervene to prevent the harm from occurring").

## VI

Next, in Count IV of the Amended Complaint, White seeks to hold the City of Southfield liable for the officers' alleged violations of her Fourth Amendment rights.  It is well-settled that a governmental entity, like the City of Southfield, cannot be held vicariously liable under 42 U.S.C. § 1983 for the acts or omissions of its

employees. *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978). Rather, to hold a municipality liable under Section 1983, a plaintiff must come forward with evidence that an unconstitutional policy, custom, or practice was the proximate cause of his injuries. *See id.* at 694. "There are at least four avenues a plaintiff may take to prove the existence of a municipality's illegal policy or custom. The plaintiff can look to (1) the municipality's legislative enactments or official agency policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005).

Here, White primarily claims that the City of Southfield failed to properly train its officers. (*See* Resp., ECF No. 54, PageID.1708-1714.)  She contends that in light of how the officers "approached and dealt with [her]," it is "clear that the City has not provided its officers with any training regarding citizens who may be suffering from [a] mental health [condition], or on how to deescalate a situation and not treat a citizen like a violent criminal." (*Id.*, PageID.1711.)

In order to prevail on that claim, White "must prove that the training program [was] inadequate to the task an officer must perform; that the inadequacy is the result of deliberate indifference; and that the inadequacy is closely related to or actually caused [her] injury." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994).  She

has failed to do so.  Indeed, she has not cited *any* evidence about the City's training program, or its alleged lack thereof, at all.[7]  She has therefore failed to show that the training program was deficient.

White also argues that the City of Southfield "followed a custom of tacit inaction or tolerance of unconstitutional policy violations." (Resp., ECF No. 54, PageID.1713.)  To establish such a claim, White would have to show "(1) a clear and persistent pattern of unconstitutional conduct by [the City's] employees; (2) the municipality's notice or constructive notice of the unconstitutional conduct; (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the policy of inaction was the moving force of the constitutional deprivation." *Winkler v. Madison Cnty.*, 893 F.3d 877, 902 (6th Cir. 2018) (internal citation and punctuation omitted).  White says that she "has sufficiently alleged that [the City of Southfield] has knowledge of prior instances of use of excessive force by its police officers" (Resp., ECF No. 54, PageID.1714), but she has not identified any *evidence* of such a pattern or of the City's knowledge of such a pattern.

For all of these reasons, the City of Southfield is entitled to summary judgment on White's municipal liability claim.

---

[7] The City, on the other hand, has presented evidence that the officers here received training, including a year-long "Field Training Program." (Mot., ECF No. 48, PageID.1079-1080. *See also* Fair Dep. at 88-92, ECF No. 48-5, PageID.1208-1212.)

## VII

Finally, the Court turns to White's state-law gross negligence and assault and battery claims.  Defendants are entitled to summary judgment on both of those claims.

## A

In Count V of the Amended Complaint, White alleges that the officers' actions and uses of force constituted actionable gross negligence under Michigan law pursuant to Mich. Comp. Laws § 691.1407.  But under Michigan law, gross negligence "is not an independent cause of action." *Bletz v. Gribble*, 641 F.3d 743, 756 (6th Cir. 2011).  Instead, it "is a prerequisite to avoiding that official's statutory governmental immunity" under Michigan law. *Id.*  Simply put, "[t]he only cause of action available to [a] plaintiff [who alleges that officers intentionally assaulted her] would be for assault and battery." *Id.* (holding that "district court erred in not dismissing plaintiff's state-law gross-negligence claim" premised on officers' use of excessive force and "revers[ing] district court's decision to deny summary judgment on [that] claim"). *See also Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 408 (6th Cir. 2007) (rejecting gross-negligence claim because it was "undoubtedly premised on the intentional tort of battery"); *Rucinski v. County of Oakland*, 655 F. App'x 338, 344 (6th Cir. 2016) (affirming summary judgment on gross negligence claim and explaining that plaintiff's "gross negligence claim fails because it is

premised on the deputies' *intentional* decision to use force") (emphasis in original).
For these reasons, Defendants are entitled to summary judgment on White's gross
negligence claim.[8]

## B

Finally, in Count VI of the Amended Complaint, White brings a state-law
claim for assault and battery against the officers. Defendants argue that the officers
are entitled to governmental immunity from that claim. (*See* Mot., ECF No. 48,
PageID.1096-1099.) The Court agrees.

Under Michigan law, a law enforcement officer is entitled to governmental
immunity from an assault and battery claim "if (1) the employee undertook the
challenged acts during the course of his employment and was acting, or reasonably
believed that he was acting, within the scope of his authority; (2) the employee
undertook the challenged acts in good faith or without malice; and (3) the acts were
discretionary, rather than ministerial, in nature." *Bletz*, 641 F.3d at 757 (citing *Odom*,
760 N.W.2d at 228). "Defendants bear the burden of establishing their entitlement
to immunity from plaintiff's state-law claims." *Id.*

---

[8] White did not present any argument in her briefing supporting her gross negligence
claim. Nor did she respond to Defendants' arguments and explain why the
Defendant officers were not entitled to summary judgment on that claim.

In this case, it appears[9] that the only issue in dispute with respect to the officers' state-law governmental immunity defense is whether they "undertook the challenged acts in good faith or without malice." *Id.* "Michigan courts have explained that the 'good faith' requirement 'is subjective in nature' and 'protects a[n officer's] honest belief and good-faith conduct with the cloak of immunity while exposing to liability a[n officer] who acts with malicious intent.' Therefore, '[a]s long as [the officer] can show that he had a good-faith belief that he was acting properly in using [] force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief.'" *Rucinski*, 655 F. App'x at 343-44 (quoting *Latits v. Phillips*, 826 N.W.2d 190, 195 (Mich. App. 2012)).

Fair, Woodside, and Rucinski have presented evidence that they acted in good faith and without malice. As Fair testified, the officers "were dispatched to a family trouble [situation and] to investigate a possible crime where [] White may or may not have assaulted someone inside the home or may or may not have been attempting to leave the residence with a child." (Fair Dep., ECF No. 48-5, PageID.1149.) Based

---

[9] The Court says "appears" because White's state-law assault and battery claim is not well developed in her briefing. After reciting the boilerplate legal standards, her argument consists of two perfunctory sentences: "Here, as discussed at length above, the Defendant Officers used excessive and unjustified force against Ms. White. Plaintiff's claims of assault and battery under Michigan law should proceed to trial and summary judgment should be denied." (Resp., ECF No. 54, PageID.1707.)

on White's behavior and interactions with the officers, Fair believed that the officers

needed to restrain White and needed do so without warning her in advance:

> I believed that it was important for either Jordan or Arthur
> or I to approach Ms. White in order to temporarily restrain
> her in order to talk to her calmly and safely about what had
> transpired inside of her house.
>
> And given her behavior, her more-than-normal behavior,
> for example, exposing herself, not listening to all of my
> commands, her, her demeanor standing in front of me and
> Jordan and Arthur, I felt that it was necessary that Ms.
> White be temporarily detained to preserve the safety of us,
> herself, and so we could further the investigation.
>
> [….]
>
> Given Ms. White's unpredictable behavior, the way that
> she was not listening to the command[s], the way that she
> lifted her dress over her head, knowing that she had just
> left the house where she could or possibly have assaulted
> somebody, where we are conducting an investigation, I
> would never suggest that one of myself, Jordan or Arthur
> give Ms. White a warning prior to approaching her or prior
> to placing her in handcuffs because it would defeat the
> whole purpose of subduing her if, if Jordan or Arthur
> would have let Ms. White know that they were going to
> approach her and handcuff her. There is no telling what
> she may have done to one of us or tried to do, jeopardizing
> her own safety as well as ours.

(*Id.* at 54, 106, ECF No. 48-5, PageID.1173, 1226. *See also* Woodside Dep. at 34,

40-41, ECF No. 48-6, PageID.1265, 1271-1272 (explaining the need to restrain

White due to her "extreme bizarre behavior" such as "lift[ing] up her dress,"

potentially being armed at one point, and "shouting" at the officers); Rucinski Dep. at 26, ECF No. 48-7, PageID.1318 (same).)

The officers also explained why they believed it was necessary to use force against White.  Fair testified that he initially "pulled [his] taser from its holster when [] White was walking quickly towards [him] and began disobeying commands." (Fair Dep. at 31, ECF No. 48-5, PageID.1151.)  He did so in order to "protect [him]self" and "give [White] ample opportunity to change her behavior." (*Id.* at 33, PageID.1153.)  Fair then observed White "swinging her arms around[,] … yelling and screaming[,]" and "doing anything she could to keep [the officers] from restraining her movements." (*Id.* at 69, PageID.1189.)  He then used his taser "to subdue [White] temporarily so [the officers] could safely place handcuffs on her." (*Id.* at 102, PageID.1222.)  Likewise, Woodside testified that because White was not "allowing [the officers] to restrain her" and "continued shouting [and] showing this really bizarre, bizarre behavior," he struck White in the face as a "distractionary technique" in order to give him and the other officers "a second to restrain [W]hite." (Woodside Dep. at 29, ECF No. 48-6, PageID.1249.)

In contrast, White has cited no evidence from which a reasonable factfinder could infer that any of the officers acted maliciously or in bad faith. At most, White's evidence establishes that the officers – when confronting a chaotic situation involving a mentally-unstable, non-compliant suspect – made certain errors.  But

even if the officers could have – or should have – made different choices, that does not mean they acted in bad faith.

That is the same conclusion the Michigan Court of Appeals reached in in *Latits*, *supra*. In that case, Laszlo Latits fled from a traffic stop and led four patrol cars on a high-speed chase. The police eventually cornered Latits, who rammed one of the patrol cars with his vehicle. One of the officers, believing Latits to pose an immediate threat to the safety of the officers, shot and killed Latits. Latits' estate brought an assault and battery claim against the officer. The Michigan Court of Appeals held that the officer was entitled to governmental immunity under Michigan law because the evidence established that he had acted in good faith:

> As long as defendant can show that he had a good-faith belief that he was acting properly in using deadly force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief. And there is no evidence in this case to show that defendant did not have such a belief.
>
> Defendant's stated reason for firing his weapon was to ensure his safety and the safety of others. The facts support the conclusion that defendant would have such a reason, and plaintiff presented no evidence to establish any other motivation.
>
> * * *
>
> Plaintiff, on the other hand, identifies no evidence supporting a finding of malice. Plaintiff spends a good portion of her argument on this point discussing whether the use of deadly force was justified. But the standard in evaluating the governmental immunity question is not

whether, when viewing the facts objectively with the benefit of hindsight, the use of deadly force was justified. Rather, as discussed in *Odom*, 482 Mich. at 481, 760 N.W.2d 217, the standard is a subjective one from the perspective of defendant with respect to whether he was acting in good faith. Whether the legal standards for acting in self-defense o0r defense of others was met is not controlling. Whether the information relayed to defendant by other officers was accurate is not relevant. What is relevant was whether defendant, in good faith, believed that he needed to fire his weapon to protect himself and others.

*Latits*, 826 N.W.2d at 195 (emphasis added).   For all of these same reasons, "[v]iewing the evidence in a light most favorable to [White], a reasonable jury would not be able to conclude that [Fair, Woodside, and Rucinski] acted in bad faith." *Bletz*, 641 F.3d at 757.  The officers are therefore entitled to summary judgment on White's state-law assault and battery claim.

## VIII

For all of the reasons explained above, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (ECF No. 48) is **GRANTED**.

**IT IS FURTHER ORDERED** that because the Court has granted Defendants' motion for summary judgment, Defendants' motion to strike (ECF No. 59) and motion *in limine* (ECF No. 60) are **TERMINATED AS MOOT**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
Dated:  December 16, 2022        UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on December 16, 2022, by electronic means and/or ordinary mail.

s/Holly A. Ryan
Case Manager
(313) 234-5126